# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ITS FINANCIAL, LLC,

        Plaintiff,

        vs.

ADVENT FINANCIAL
SERVICES, LLC., *et al.*,

        Defendants.

Case No. 3:10-cv-41

Judge Timothy S. Black

## ORDER: (1) GRANTING DEFENDANT NOVASTAR FINANCIAL INC.'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT (Docs. 47, 52 ); AND (2) DENYING PLAINTIFF'S AND GUARANTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 53)

This civil action is now before the Court on NovaStar Financial Inc.'s motions for partial summary judgment (Docs. 47, 52); Plaintiff ITS's and the Guarantors'[1] memorandum in opposition to NovaStar's motion for partial summary judgment and their motion for summary judgment as to Novastar Financial's Amended Counterclaim and Complaint (Doc. 53); and NovaStar's responsive memorandum (Doc. 56).

## I.     BACKGROUND FACTS

Defendant NovaStar Financial, Inc. ("NovaStar") moves for partial summary judgment with respect to Count I (breach of the promissory note), Count II (declaratory judgment relating to the security agreement), and Count III (breach of the security agreement) of its Amended Counterclaim against ITS. (Doc. 47).

---

[1] "Guarantors" refers to Defendants Fesum Ogbazion and TCA Financial LLC.

ITS failed to make interest payments due on a $3,000,000 Note in January, February, and March of 2010. Accordingly, NovaStar claims that ITS defaulted, the monies due were accelerated, and additional interest and late fees triggered.[2] The Note matured by its terms on March 15, 2010.

The Security Agreement provided that, among other things, upon ITS's failure to perform its obligations under the Note, NovaStar could collect any pledged collateral in order to secure ITS's performance under the Note. The pledged collateral specifically included accounts owed to ITS by third parties. However, when ITS defaulted on the Note and NovaStar sought to obtain an account payable owed to ITS by Drake, ITS resisted NovaStar's attempt to obtain the collateral by directing Drake not to transfer the funds to NovaStar. NovaStar claims that it is entitled to the Drake account, and that ITS's conduct is a breach of the Security Agreement. Accordingly, NovaStar requests that this Court enter a declaration that NovaStar is entitled to the Drake account, enter a judgment of liability against ITS for breach of the Security Agreement with the precise damages to be proven subsequently, and direct ITS to cease interfering with NovaStar's attempts to collect collateral encompassed by the Security Agreement.

ITS claims that it has a defense of "setoff" to the Amended Counterclaim and requests that the Court enter summary judgment in ITS' favor with respect to all Counts of NovaStar's Amended Counterclaim.

_____

[2] Specifically, NovaStar claims that it is owed the principal sum of $3,000,000, plus $105,000 in scheduled interest payments that were missed, a facility fee, additional interest, late fees, and attorneys fees. (Doc. 47 at 3).

NovaStar also seeks summary judgment on Counts I and II of its Amended

Complaint (Doc. 22) against the Guarantors for breach of the unconditional Guaranties

they executed in favor of NovaStar with respect to the Promissory Note executed by ITS.

(Doc. 52).

Conversely, the Guarantors request that the Court enter summary judgment in their

favor with respect to all Counts of NovaStar's First Amended Complaint. The Guarantors

claim that NovaStar's motions should be denied because the Promissory Note, the

Security Agreement, and the Guaranties cannot be enforced because of the Subordination

Agreement between Fifth Third Bank and NovaStar.

## II.  UNDISPUTED FACTS AS TO NOVASTAR'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE AMENDED COUNTERCLAIM[3]

### The Note

1.  ITS is engaged in the business of franchising business opportunities nationwide in the tax preparation and related bank products business. (Doc. 47, Ex. A; Doc. 3 at ¶ 1).

2.  On or about November 25, 2009, ITS and NovaStar entered into the Note, pursuant to which NovaStar lent ITS the sum of $3,000,000. (*See* Doc. 47, Exs. B, C, Ex. E at ¶¶ 3-5; Doc. 44 at ¶ 4; Doc. 45, Ex. D).

3.  In pertinent part, the Note states:

FOR VALUE RECEIVED, the undersigned ITS FINANCIAL, LLC . . . promises to pay to the order of NOVASTAR FINANCIAL, LLC . . . the principal sum of THREE MILLION AND NO/100 DOLLARS ($3,000,000.00) in lawful money of the United States of America, with

---

[3]  *See* Docs. 47, 65. ITS does not contest any of NovaStar's proposed undisputed facts.

interest hereon to be computed on the unpaid principal balance from time to time outstanding at the Applicable Interest Rate (as hereinafter defined), and to be paid in installments as follows:

    A.    An amount equal to all accrued and unpaid interest, on the first day of December 2009 and on the first day of each calendar month thereafter until the Maturity Date; and

    B.    The balance of said principal sum together with all accrued and unpaid interest thereon shall be due and payable on March 15, 2010 (the "Maturity Date"). Interest on the principal sum of this Promissory Note ("Note") shall be calculated on the basis of the actual number of days elapsed over a three-hundred-sixty (360) day year.

*See* Note at 1.

4.    The Note defines a number of key terms, including:

    Definitions.  As used in this Note

(a)    **"Applicable Interest Rate"** shall mean a rate per annum equal to twelve percent (12.0%).

         \*     \*     \*

(c)    **"Debt"** is used herein in its most comprehensive sense and shall mean collectively, the whole of the principal sum of this Note, together with all interest accrued and unpaid thereon and all other indebtedness or sums due from Borrower to Lender under the Note or the Loan Documents.

*Id.* at 1-2.

5.    The Note states that a failure to make payments due constitutes an event of default:

    Default.    **"Event of Default."** wherever used herein, means any one of the following events:

(a)    Default in the payment of the Note or any default with respect to any

-4-

other indebtedness from Borrower to Lender as such indebtedness becomes due and payable;

*See id.* at 2.

6.   The Note requires the borrower to pay an increased rate of interest in the event of a default. Specifically:

Default Interest. Borrower does hereby agree that from the date of the occurrence of an Event of Default (including upon the failure of Borrower to pay the Debt in full on the Maturity Date), Lender shall be entitled to receive and Borrower shall pay interest on the entire unpaid principal sum and any other amounts due at the Default Rate, until the date that such Event of Default is waived by Lender in writing.

*Id.* at 3.

7.   The Note also requires the borrower to pay a facility fee at the Maturity date:

Facility Fee. The Borrower agrees to pay to the Lender an [sic] facility fee in an amount equal to Two Hundred Thousand and No/100 Dollars ($200,000.00) minus all accrued interest which has been paid to the Lender hereunder, which facility fee shall be due and payable on the Maturity Date (the "Facility Fee"). The Lender's attorney fees relating to the origination of the Loan and the draft and negotiation of the initial Loan Documents shall be paid from the Facility Fee.

*Id.*

8.   The Note also states that an event of default, at the option of NovaStar, leads to automatic acceleration of the principal amount and all accrued interest. Specifically:

Acceleration. The whole of the Debt, including without limitation, the principal sum of the Note, all accrued interest and all other sums due under this Note shall become immediately due and payable at the option of Lender, without notice, at any time following the occurrence of an Event of Default . . .

*Id.*

9.  The Note also states that NovaStar is entitled to recover attorney's fees incurred in collecting under the terms of the Note. Specifically:

    Attorney Fees. In the event that Lender employs attorney(s) to collect the Debt, to enforce the provisions of this Note or to protect or foreclose the security herefor, Borrower agrees to pay Lender's attorney fees and disbursements, whether or not suit be brought. Such fees shall be immediately due and payable.

    *Id.*

10. In the Note, ITS waived "the right to claim any defense based on any statute of limitations or any claim of laches and waives any counterclaim, cross-claim, or set-off of any nature or description." *Id.* at 4.

11. According to the terms of the Note, it "shall be governed and construed in accordance with the laws of the State of Missouri." *Id.* at 4.

### ITS Fails to Make Payments Due Under the Note

12. ITS failed to make required interest payments due on January 1, February 1, and in March 2010. (Counterclaim ¶ 9; Answer ¶ 9).

13. By its terms, and regardless of acceleration, the Note matured on March 15, 2010, and all indebtedness is now due and payable. (Counterclaim ¶ 15; Answer ¶ 15; Note at 1).

14. However, ITS has not made any interest, principal, or other payments due under the Note since it missed the required interest payment due on January 1, 2010. (Doc. 47, Ex. 5 at ¶¶ 6-9).

### The Security Agreement

15. On or about November 25, 2009, concurrent with execution of the Note, ITS and NovaStar entered into a Security Agreement by which ITS pledged as security for its obligations under the Note, numerous classes of property. (Doc. 47, Ex. 6; Counterclaim at ¶ 19; Answer at ¶ 19).

16. The Security Agreement provided:

SECTION 2. <u>Grant of Security</u>.  Borrower hereby assigns and pledges to Lender and grants to Lender a security interest in all of Borrower's rights, title and interest now owned or hereafter acquired, leased or arising in and to all of the following (collectively the "Collateral").

(a)    <u>Accounts</u>.  All "accounts," as such term is defined in the Uniform Commercial Code of Missouri (the "Code") (including but not limited to accounts from Advent Financial Services LLC, a Delaware limited liability company), now owned or hereafter acquired by Borrower.

(Security Agreement at Section 2(a); Counterclaim ¶ 20; Answer ¶ 20).

17.    The Security Agreement states that the collateral was pledged by ITS to: secure the payment and performance of any and all advances, debts, obligations and liabilities of Borrower to Lender, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary, and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any transaction or arrangement at any time entered into by Borrower with Lender, including but not limited to the Note . . .

(Security Agreement at Section 3; Counterclaim at ¶ 21; Answer at ¶ 21).

18.    In the "Event of Default" under the Security Agreement, ITS agreed that it

hereby irrevocably appoints Lender as its agent and attorney-in-fact, with full authority in the place and stead of said Borrower and in the name of said Borrower or otherwise, from time to time in Lender's discretion, to take any action and to execute any instrument which Lender may deem necessary or advisable to accomplish the purposes of this Security Agreement including, without limitation, the authority to, in Lender's name or in Borrower's name:

(a)    ask, demand, collect, sue for, recover, compound, receive, grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any such account debtor or other obligor and to give acquittance and receipts for monies due and to become due under or in respect of any of the Collateral.

*     *     *

    (d)    notify any account debtor or other person obligated to pay the amount due that such right to payment has been assigned or transferred to Lender for security and shall be paid directly to Lender (Borrower will join in giving such notice if Lender so requests) . . .

(Security Agreement at Section 7(a) & (d); Counterclaim at ¶ 22; Answer at ¶ 22).

19.    The Security Agreement defines an "Event of Default," among other things, as "[t]he failure by Borrower to perform any obligation or the inaccuracy of any representation or warranty contained in any other agreement or contract to which Borrower and Lender are a party." (Security Agreement at Section 8(c); Counterclaim at ¶ 23; Answer at ¶ 23).

20.    The Security Agreement further provided that, in the Event of Default, NovaStar

may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the Code (whether or not such Code applies to the affected Collateral) and may also (i) require Borrower to, and Borrower hereby agrees that it will at its expense and upon request of Lender forthwith, assemble all or part of the Collateral as directed by Lender and make it available to Lender at places to be designated by Lender which are reasonably convenient to both parties.

(Security Agreement at Section 9(a); Counterclaim ¶ 24; Answer ¶ 24).

21.    Under the Security Agreement, ITS agreed to pay NovaStar's reasonable expenses (including attorney fees and expert fees) incurred in collecting the collateral in connection with ITS's breach of the Note. Specifically, the Security Agreement states:

**SECTION 10. <u>Indemnity and Expenses</u>.** Borrower will:

    (b)    upon demand pay to Lender the amount of any and all reasonable expenses, including the reasonable fees and disbursements of its counsel and of any experts and agents,

-8-

which Lender may incur in connection with (i) the custody, preservation, use or operation of or the sale of, collection from or other realization upon, any of the Collateral; (ii) the exercise or enforcement of any of the rights of Lender hereunder or under any agreement relating to Lender's rights to and interest in the Collateral; or (iii) the failure by Borrower to perform or observe any of the provisions hereof or under the Note or any other agreement relating to Lender's right to and interest in the Collateral.

(Security Agreement at Section 10(b); Counterclaim ¶ 25; Answer ¶ 25).

22. Lastly, the Security Agreement provided that it "shall be deemed to have been made by Borrower and accepted by Lender in the State of Missouri, and it shall be governed by and construed in accordance with the laws of the State of Missouri." (Security Agreement at Section 16).

### ITS Breaches The Terms Of The Security Agreement

23. As noted above, ITS has failed to make interest and principal payments due under the terms of the Note. (*See* ¶¶ 12-14, *supra*).

24. At the same time these events occurred, ITS was owed approximately $1,000,000 on an account payable from Drake, pursuant to a contractual relationship between Drake and ITS. (*See* Counterclaim ¶¶ 27, 31; Answer ¶¶ 27, 31).

25. On January 29, 2010, counsel for NovaStar sent a letter to Drake notifying it that the account payable to ITS had been pledged by ITS to NovaStar as collateral under the Security Agreement, that ITS had defaulted under the Note, that NovaStar was therefore entitled to receive the Drake account pursuant to the terms of the Security Agreement, and directing Drake to make payments directly to NovaStar. (Counterclaim ¶ 28; Answer ¶ 28).

26. On February 9, 2010, counsel for ITS sent a letter to Drake protesting NovaStar's letter and advised Drake that it had no obligation to honor the Security Agreement because ITS had filed a lawsuit against NovaStar relating to the Note. (*See* Ex. G; Ex. H at ¶¶ 5-7; Counterclaim ¶ 29; Answer ¶ 29).

27. Since the exchange of letters, Drake has declined to make payment directly to NovaStar on the account, and it has also declined to make payment directly to ITS. (*See* Counterclaim ¶ 30; Answer ¶ 30).

28. ITS has interfered and obstructed NovaStar's attempts to demand and collect the Drake account by, among other things, directing Drake not to transfer the account directly to NovaStar. (Counterclaim ¶ 79; Answer ¶ 79).

## III. UNDISPUTED FACTS AS TO NOVASTAR'S MOTION FOR SUMMARY JUDGMENT ON THE FIRST AMENDED COMPLAINT[4]

1 -9. *See* The Note, *supra.*

### The Guaranties

10. On November 25, 2009, contemporaneously with the Promissory Note, Ogbazion and TCA each entered into a Guaranty with NovaStar. (Doc. 52, Exs. E, F; Complaint at ¶¶ 23, 28; Answer at ¶¶ 23, 28; Anderson Declaration at ¶¶ 10-11).

11. The Ogbazion Guaranty states in pertinent part:

ACCORDINGLY, the Guarantor, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agrees as follows:

1. Definitions. All terms defined in the Promissory Note that are not otherwise defined herein shall have the meanings given them in the Promissory Note.

2. Debt Guaranteed. The Guarantor absolutely and unconditionally guarantees to Lender the full and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of the Debt.

---

[4] *See* Docs. 52 and 67. The Guarantors do not contest any of NovaStar's proposed undisputed facts.

3.  Unconditional Guaranty.  No act or thing need occur to establish the liability of the Guarantor hereunder, and no act or thing, except full payment and discharge of all of the Debt, shall in any way exonerate the Guarantor hereunder or modify, reduce, limit, or release Guarantor's liability hereunder.  This is an absolute, unconditional and continuing guaranty of payment of the Debt and shall continue to be in force and be finding upon the Guarantor, whether or not all of the Debt is paid in full, until this Guaranty is revoked prospectively as to future transactions, by written notice actually received by Lender, and such revocation shall not be effective as to the amount of Debt existing or committed for at the time of actual receipt of such notice by Lender, or as to any renewals, extensions, refinancing or refunds thereof.  The death or incompetence of the Guarantor shall not revoke this Guaranty, except upon actual receipt of written notice thereof by Lender and only prospectively, as to future transactions, as herein set forth.

*See* Ogbazion Guaranty at 1.

12.  The Ogbazion Guaranty states that the guarantor will reimburse NovaStar for any costs NovaStar incurs in seeking to collect on the Debt or to enforce the Ogbazion Guaranty.  Specifically:

Enforcement Expenses: The Guarantor will pay to reimburse Lender for all costs, expenses, and reasonable attorneys' fees paid or incurred by Lender in endeavoring to collect and enforce the Debt and in enforcing this Guaranty.

*Id.* at 2.

13.  The Ogbazion Guaranty states that Ogbazion waives all defenses of ITS except payment in full, including the defense of setoff.  Specifically:

Waivers by Guarantor.  The Guarantor waives any and all defenses, claims, setoffs and discharges of the Borrower, or any other obligor, pertaining to the Debt, except the defense of discharge by payment in full.  Without limiting the generality of the foregoing, the Guarantor will not assert, plead or enforce against Lender any defense of waiver, release, discharge, or disallowance in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statue, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other person

liable in respect of any of the Debt, or any setoff available against Lender to the Borrower or any other such person, whether or not on account of a related transaction . . . The Guarantor waives presentment, demand for payment, notice of dishonor or nonpayment and protest of any instrument evidencing the Debt. Lender shall not be required first to resort for payment of the Debt to the Borrower or other persons, or their properties, or first to enforce, realize upon or exhaust any collateral security for the Debt, before enforcing the Guaranty.

*Id.* at 3.

14.    The Ogbazion Guaranty provides that it "shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of Missouri." *Id.* at 4.

15.    The TCA Guaranty states in pertinent part:

ACCORDINGLY, the Guarantor, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby agrees as follows:

1.    Definitions.  All terms defined in the Promissory Note that are not otherwise defined herein shall have the meanings given them in the Promissory Note.

2.    Debt Guaranteed.  The Guarantor absolutely and unconditionally guarantees to Lender the full and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, fo the Debt.

                    *        *        *

4.    Unconditional Nature.  No act or thing need occur to establish the liability of the Guarantor hereunder and no act or thing, except full payment and discharge of all of the Debt, shall in any way exonerate the Guarantor hereunder or modify, reduce, limit, or release Guarantor's liability hereunder. This is an absolute, unconditional and continuing guaranty of payment of the Debt and shall continue to be in force and be binding upon the Guarantor, whether or not all of the Debt is paid in full, until this Guaranty is revoked prospectively as to future transactions, by written notice actually received by

-12-

Lender, and such revocation shall not be effective as to the amount of Debt existing or committed for at the time of actual receipt of such notice by Lender, or as to any renewals, extensions, refinancing or refunds thereof.

*See* TCA Guaranty at 1 & 2.

16. The TCA Guaranty states that the guarantors will reimburse NovaStar for any costs NovaStar incurs in seeking to collect on the Debt or to enforce the TCA Guaranty. Specifically:

Enforcement Expenses. The Guarantor will pay or reimburse Lender for all costs, expenses, and reasonable attorneys' fees paid or incurred by Lender in endeavoring to collect and enforce the Debt and in enforcing this Guaranty.

*Id.* at 2.

17. The TCA Guaranty waives all defenses of ITS except payment in full, including the defense of setoff. Specifically:

Waivers by Guarantor. The Guarantor waives any and all defenses, claims, setoffs and discharges of the Borrower, or any other obligor, pertaining to the Debt, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Guarantor will not assert, plead or enforce against Lender any defense of waiver, release, discharge or disallowance in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other person liable in respect of any of the Debt, or any setoff available against Lender to the Borrower or any other such person, whether or not on account of a related transaction . . .The Guarantor waives presentment, demand for payment, notice of dishonor or nonpayment and protest of any instrument evidencing the Debt. Lender shall not be required first to resort for payment of the Debt to the Borrower or other persons, or their properties, or first to enforce, realize upon or exhaust any collateral security for the Debt, before enforcing the Guaranty.

*Id.* at 3.

18. The TCA Guaranty mandates that it "be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of Missouri." *Id.* at 4.

**ITS Fails To Make Payments Due Under The Promissory Note; Defendants Fail to Perform Under The Terms Of The Guaranties**

19. ITS made its first interest payment due under the terms of the Promissory Note on December 1, 2009. (*See* Complaint at ¶ 14; Answer at ¶ 14).

20. However, thereafter, ITS failed to make the required interest payments due on January 1, February 1, and in March 2010. (Anderson Declar. at ¶ 6; Complaint at ¶ 15; Answer at ¶ 15).

21. By its terms, and regardless of acceleration, the Promissory Note matured on March 15, 2010, and all indebtedness is now due and payable. (*See* Note at 1).

22. Since the Note's maturity, ITS has not paid any interest due and owing, nor has ITS repaid NovaStar for any portion of the principal sum of $3,000,000. (Anderson Declar. at ¶¶ 7-8).

23. Defendants have refused to compensate NovaStar for any amounts owed by ITS under the Promissory Note. (*See* Anderson Declar. at ¶ 12).

## IV.   STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## V.   ANALYSIS

### A.   Breach of the Promissory Note, Security Agreement, and Guaranties

ITS and the Guarantors did not contest any of the proposed undisputed material facts asserted in NovaStar's motions and thereby concede the factual predicates for NovaStar's claims. Based on these undisputed facts, and as explained in NovaStar's

motions, ITS is in breach of its obligations under the Promissory Note[5] and Security Agreement,[6] with liability to NovaStar well in excess of $3 million. The Guarantors have refused to make good on NovaStar's debt, so the Guarantors are similarly liable for breach of the Guaranties. Accordingly, ITS and the Guarantors can only defeat NovaStar's motions by maintaining a valid affirmative defense.

---

[5]  The holder of a note makes a *prima facie* case by producing a note admittedly signed by the maker and showing the balance due. *Misemer v. Freda's Restaurant*, 961 S.W.2d 120, 121 (Mo. Ct. App. 1998). Plaintiff ITS admitted that it executed the Note on or about November 25, 2009. (Counterclaim ¶ 4; Answer ¶ 4). ITS signed the Note in consideration of NovaStar lending ITS $3,000,000, and NovaStar lent ITS $3,000,000 in consideration of ITS repaying the said loan under the terms of the Note. (Note at 1). ITS admitted that NovaStar performed all of its obligations under the Note. (Counterclaim at ¶ 54; Answer at ¶ 54). Therefore, there is a valid promissory note, and NovaStar performed all of its obligations with respect thereto. Pursuant to the terms of the Note, ITS was required to make interest payments on the principal sum. (Note at 1). Additionally, ITS was obligated to pay any other accrued interest, together with the principal sum on the Maturity Date. *Id.* ITS's failure to make payments as required constitutes a default on the Note. (Note at 2).

[6]  In order to state a cause of action for breach of contract, NovaStar must prove: (1) existence of a contract; (2) performance under the contract by one party; (3) breach of the contract by the other party; and (4) damages. *Keveny v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010). To establish an enforceable security interest: (1) value must be given in exchange for the security interest; (2) the debtor must have right sin the collateral or the power to transfer rights in the collateral to a secured party; and (3) a security agreement, describing the collateral, must be signed by the debtor. Mo. Rev. Stat. § 400.9-203. In order to secure the payment and performance of the Note, ITS executed the Security Agreement thereby granting NovaStar a security interest in various categories of property, including, among other things, accounts owed to ITS. (Security Agreement at Sec. 2,3; Counterclaim at ¶¶ 19, 21; Answer at ¶¶ 19, 21). ITS admitted that it executed the Security Agreement. (*See* Security Agreement at 8; Counterclaim at ¶ 19; Answer at ¶ 19). Additionally, ITS admitted that NovaStar's security interest was exchanged for value – in exchange for the security interest granted to NovaStar, it loaned ITS $3,000,000. (Security Agreement at 1). Lastly, ITS admitted that it had rights in the collateral pledged, specifically the collateral in question – the Drake account. (Counterclaim at ¶ 27; Answer at ¶ 27). Such admissions establish the existence of a valid and enforceable security interest on behalf of NovaStar and the existence of a valid and enforceable Security Agreement between ITS and NovaStar.

## B.    Subordination Agreement

ITS claims that an executed Subordination Agreement precludes NovaStar from

bringing its Counterclaim and Amended Complaint. (Doc. 53, Ex. B at ¶¶ 3-6). ITS

claims that at the time of the November 25, 2009 transaction, Fifth Third Bank was the

primary secured creditor of ITS, holding several million dollars in debt obligations, which

were all secured by a blanket lien on all of ITS' assets. (*Id.* at ¶ 4). In order for the

Security Agreement to proceed between ITS and NovaStar, Fifth Third had to agree to

partially subordinate its prior security interests as outlined in the Subordination

Agreement. (*Id.* at ¶ 5). Specifically, ITS claims that as long as the Fifth Third

Obligations remained unpaid, the Subordination Agreement prohibits NovaStar from

taking any form of action to collect on its Note or Security Agreement with ITS. This

provision – where a junior creditor waives its right to file an action until the senior

creditor has been paid in full – is known as a standstill provision.[7]

ITS maintains that on or about December 17, 2010, all of Fifth Third's rights

(including the loan obligations, security interests, and Subordination Agreement) were

assigned by Fifth Third to a company called The Pink Daisy. (*See* Doc. 53, Ex. C, Ex. A

at ¶¶ 9, 7). ITS claims that The Pink Daisy now holds the Fifth Third Obligations and

---

[7] The Subordination Agreement provides that it is governed by Ohio law. While it appears
that there are no Ohio cases specifically finding that "standstill" provisions are enforceable, there
are also no cases finding them unenforceable. ITS claims that the standstill provision is
enforceable based on case law from other jurisdictions. *See, e.g., SCR Joint Venture v.
Warshawsky*, 559 F.3d 133 (2nd Cir. 2009); *Noonan v. Wonderland Greyhound Park Realty*, 723
F.Supp.2d 298, 311-312 (D.Mass. 2010).

"stands in the shoes of" Fifth Third for all purposes related to the loan documents at issue. Therefore, ITS maintains that NovaStar is prohibited from filing an action to collect on its Note until The Pink Daisy is paid in full (or NovaStar must obtain the consent of The Pink Daisy prior to filing the action).[8] Accordingly, ITS claims that the Court should grant summary judgment against NovaStar on its Amended Counterclaim and First Amended Complaint because the claims made therein are currently barred by NovaStar's Subordination Agreement.

Pursuant to the terms of the Security Agreement, in the event of default, ITS appointed NovaStar as agent and attorney-in-fact with authority to demand and collect any account and/or notify an account debtor to pay the amount due directly to NovaStar:

> (f) Except as expressly set forth in Section 2.1(a), NovaStar will not commence any action or proceeding against the [ITS], Ogbazion, or TCA or take any other action (including with respect to the collateral) to recover any part of the NovaStar Obligations . . . unless requested by Fifth Third . . . unless and until the Fifth Third obligations shall be indefeasibly paid in full.

(Subordination Agreement, Section 2.2(f)).

The first clause in this paragraph creates an exception to the requirement that NovaStar not enforce its rights against ITS or the Guarantors without the permission of Fifth Third. Section 2.1(a) of the Subordination Agreement confirms the scope of the exception and broadly subordinates most of NovaStar's rights in collateral to the rights of

---

[8] It is undisputed that The Pink Daisy has not been paid in full. (Doc. 53, Ex. A at ¶ 8). It is also undisputed that The Pink Daisy never provided consent to NovaStar to file an action against ITS or otherwise waived Section 2.2(f) of the Subordination Agreement. (*Id.* at ¶ 10).

Fifth Third and states that NovaStar:

> will not take or receive from the [ITS], Ogbazion, and TCA or
> the Collateral, by set-off or in any other manner, payment of the
> whole or any part of the NovaStar Obligations, unless and until
> all of the Fifth Third Obligations shall have been indefeasibly
> fully paid.

However, 2.1(a) goes on to provide that:

> Notwithstanding the foregoing, NovaStar shall have the right to
> receive and apply to the NovaStar Obligations,[9] the Advent Fees,[10]
> until such time as principal, interest and fees of the NovaStar
> Obligations are indefeasibly paid in full; provided however that
> such principal amount shall not exceed $3,000,000, interest shall
> accrue at a rate not to exceed 12.0% per annum, or if an event of
> default has occurred and is continuing under the NovaStar
> Agreement, 17.0% per annum and the amount of such fees shall
> not exceed $200,000 less the amount of interest paid or payable by
> the Company pursuant to the NovaStar Agreements . . .

Therefore, Section 2.1(a) permits NovaStar to satisfy the "NovaStar Obligations"

– i.e., amounts owed by ITS and the Guarantors – by executing its security interest in the

Drake account until NovaStar has been "indefeasibly paid in full" the principal amount of

$3,000,000 interest accruing at a rate of 17.0% (because of the admitted Event of

---

[9] The term "NovaStar Obligations" is defined in Section 1(a) as "all Liabilities of [ITS], Ogbazion and TCA to NovaStar arigins out of and relating to the [Promissory Note and Security Agreement] and the NovaStar Guaranties." (Subordination Agreement, Section 1(a)).

[10] The term "Advent Fees" is defined in Section 1(a) of the Subordination Agreement to include: (a) fees due to Advent from ITS under the License and Operations Agreement; and (b) fees due to Advent from ITS under the License and Operations Agreement; and (b) fees owed by Drake Enterprises Ltd. to ITS under the Tax Services Agreement. (Subordination Agreement, Section 1(a)). The fees owed by Drake Enterprises constitute the Drake account that is central to NovaStar's claims under the Security Agreement (Counts II and III of NovaStar's Amended Counterclaim).

Default), and fees of $200,000. The right to collect in this manner is expressly exempted from the "permission requirement" created by Section 2.2(f).

NovaStar claims that because ITS interfered with its attempt to directly collect the Drake account[11] as collateral, it had to file this lawsuit in order to pursue its collection rights.[12] This Court agrees that the only logical reading of Section 2.2(f) and 2.1(a) is that NovaStar is permitted to file a lawsuit against ITS and the Guarantors, establish the amount ITS and the Guarantors are liable for, and then, without permission of Fifth Third (or now Pink Daisy), satisfy that judgment by executing on the Drake account until the NovaStar obligations are "indefeasibly paid in full."

This Court interprets the Subordination Agreement to provide that NovaStar must obtain Pink Daisy's permission only when it desires to satisfy the NovaStar obligations by executing on other collateral apart from the "Advent Fees." The purpose of the Subordination Agreement was to subordinate Advent's rights in all collateral to those of Fifth Third except for the "Advent Fees," which include the Drake account. Thus, it

---

[11] NovaStar loaned $3,000,000 to ITS pursuant to the Promissory Note. As an inducement to NovaStar loaning that money, ITS entered into a Security Agreement with NovaStar that gave NovaStar a security interest in all of ITS's assets, including the Drake account. As a further inducement, Guarantors entered into Guaranties of ITS's obligations. At the same time, NovaStar and Fifth Third entered into a Subordination Agreement that specifically gave NovaStar priority in the Drake account. Then, ITS breached the Promissory Note, and the Guarantors refused to honor their Guaranties. When NovaStar attempted to collect on the Drake account, ITS blocked NovaStar's attempts by directing Drake not to pay.

[12] Where a debtor defaults on its obligations and refuses to turn over collateral, secured creditors typically collect on a security interest by filing a lawsuit to establish the amount the debtor owes to the secured creditor and then use the legal proceedings to satisfy the debt by executing on the collateral.

follows that Fifth Third's (now Pink Daisy's) permission would not be required to file a lawsuit and collect on the "Advent Fees," but would only be required to collect on any other collateral. Therefore, the Subordination Agreement does not defeat NovaStar's motions.

Moreover, the Guarantors do not have standing to assert rights under the Subordination Agreement because the Agreement expressly states that it is enforceable only by Fifth Third, NovaStar, and their successors, transferees, and assigns. By its express terms the Subordination Agreement is an "intercreditor agreement" that fixes priority as between NovaStar and Fifth Third over certain collateral of ITS and the Guarantors. (*See* Subordination Agreement at Sections 1 & 9). Although ITS and the Guarantors signed the Subordination Agreement, they do not have the right to enforce it.[13] The Subordination Agreement expressly states that it shall "inure to the benefit of and be enforceable by, Fifth Third, NovaStar, and their respective successors, transferees and assigns." (Subordination Agreement, Section 4.2(iii)).[14] Because the Subordination

_____

[13] There are two primary reasons why ITS and the Guarantors signed the Subordination Agreement even though they do not have the right to enforce it. First, NovaStar would have required the Guarantors to sign so they could not argue their obligations under the Guaranties were waived. Second, ITS and the Guarantors signed the Subordination Agreement as a recognition that they were aware of the respective creditors' positions so they would not direct collateral to a creditor that did not have priority. (Subordination Agreement, Section 2.1(b)).

[14] Where debtors like ITS and the Guarantors attempt to enforce subordination agreements, courts have held that they lack standing to enforce the agreements. *See In re Kors*, 819 F.2d 19, 22 (2d Cir. 1987) (holding that a subordination agreement may only be enforced by the parties entitled to priority under that agreement); *In re El Paso Refinery*, 171 F.3d 249, 257-58 (5th Cir. 1999) (holding that a debtor did not have the right to enforce its creditors' subordination agreement).

Agreement does not grant ITS and the Guarantors the right to enforce, and they are not

successors, transferees, or assignees of Fifth Third, they cannot raise the Subordination

Agreement as a defense.

## C. Setoff

ITS concedes that it has no setoff defense to NovaStar's claim under the

Promissory Note, but claims that it has a setoff defense with respect to NovaStar's claim

for breach of the Security Agreement. ITS maintains that because the Security

Agreement remains subject to setoff against ITS's claims, NovaStar's claims seeking to

obtain the collateral provided in the Security Agreement must be stayed until the entire

case is decided.

However, the Security Agreement is simply a means of securing the debts owed

under the Promissory Note. Therefore, because the Promissory Note bars the defense of

setoff, ITS cannot assert setoff to block NovaStar's rights under the Security

Agreement.[15] Even if ITS had properly pled setoff, setoff is only appropriate when the

defendant seeks to reduce the amount of a judgment against it by a liquidated debt owed

to the defendant by the plaintiff. *RPM Leasing Corp. v. Coleman Powermate, Inc.*, 2007

WL 3072056, at \*5 (W.D. Mo. 2007) (describing setoff as being founded on a

---

[15] Moreover, ITS never asserted the affirmative defense of setoff with respect to NovaStar's claims under the Security Agreement, it only asserted the affirmative defense as to NovaStar's claim under the Promissory Note. In fact, ITS admits that it "intended" the affirmative defense to apply to all of NovaStar's claims, implying that it did not so plead.

"liquidated" debt).[16] While ITS disputes that a true setoff defense must be based on a liquidated debt, it cites *Edmonds v. Stratton*, 467 S.W.2d 228 (Mo. Ct. App. 1970), which rejected a setoff defense because it was not predicated upon a liquidated debt. *Id.* at 233. *Edmonds* explains that if a defendant has an unliquidated claim against a plaintiff (which is what ITS has in the instant case), the defendant's remedy is to assert its own affirmative claim (typically a counterclaim), which is what ITS has done through its tort claims. *Id.* Because there is no basis for "setoff," this Court enters summary judgment in favor of NovaStar. Moreover, even if a setoff were proper, setoff is not a defense to liability and thus does not foreclose summary judgment.[17]

## VI.    CONCLUSION

Based on the evidence of record:

1.    NovaStar's motion for partial summary judgment (Doc. 47) is **GRANTED**. Specifically:

- Summary Judgment is granted in favor of NovaStar with respect to Counts I, II, and III of NovaStar's Amended Counterclaim;

---

[16] "[U]nliquidated damages are not the subject of set-off." *Myers v. Estell*, 47 Miss. 4, 17 (Miss. 1972). "Unliquidated damages are those that have been established by a verdict or award but cannot be determined by a fixed formula, so they are left to the discretion of the judge or jury." *Sports Page, Inc. v. Punzo*, 900 So. 2d 1193, 1206-7 (Miss. Ct. App. 2005). Liquidated damages are set or determined by a contract. *Id.*

[17] Because ITS and the Guarantors' arguments fail to defeat summary judgment in favor of NovaStar, they clearly fail to support summary judgment in their favor.

- ITS is liable for breach of the Note with damages equal to the principal sum of $3,000,000 which has never been paid, scheduled interest payments that were missed in January, February, and March 2010 -- totaling $105,000, a facility fee, and such additional interest, late fees, and attorney's fees incurred in enforcing NovaStar's rights under the Note;[18]

- ITS is liable for breach of the Security Agreement with damages equal to the value of the account payable from Drake Enterprises Ltd., together with such attorney's fees and costs that NovaStar has incurred in prosecuting Counts II and III of its Amended Counterclaim;[19]

- ITS is hereby **ORDERED** not to interfere with NovaStar's attempts to collect the Drake account under the Security Agreement or any other collateral that NovaStar is entitled to collect under the Security Agreement;

- The Security Agreement is enforceable;

- NovaStar has the right to demand and receive the Drake account pursuant to the terms of the Security Agreement, and ITS has no right or basis upon which to contest NovaStar's demand for and receipt of the Drake account; and

- As between NovaStar and ITS, NovaStar has the superior right to the Drake account.

2. NovaStar's motion for partial summary judgment on Counts I and II of its First Amended Complaint (Doc. 52) is **GRANTED**. Specifically:

- Defendants Fesum Ogbazion and TCA Financial, Inc. are liable for breach of their respective Guaranties with damages equal to the principal sum of $3,000,000 which has never been paid, scheduled interest payments that were missed in January, February, and March 2010 -- totaling $105,000, a facility fee, and such additional interest,

---

[18] NovaStar shall now evidence by verified pleading the precise amount of these damages.

[19] NovaStar shall now evidence by verified pleading the precise amount of these damages.

late fees, and attorney's fees incurred in enforcing NovaStar's rights under the Promissory Note and Guaranties.[20]

3.    Plaintiff's and Guarantors' motion for summary judgment (Doc. 53) is **DENIED**.

**IT IS SO ORDERED.**

Date:  _10/11/11_

                                              Timothy S. Black
                                              United States District Judge

---

[20] NovaStar shall now evidence by verified pleading the precise amount of these damages.