# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ITS FINANCIAL, LLC,

      Plaintiff,

    vs.

ADVENT FINANCIAL
SERVICES, LLC., *et al.*,

      Defendants.

Case No. 3:10-cv-41

Judge Timothy S. Black

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 48)

This civil action is presently before the Court on motion for partial summary

judgment filed by Defendant Advent Financial Services, LLC's and Defendant/

Counterclaimant NovaStar Financial, Inc. (collectively "Defendants") (Doc. 48), and

the parties' responsive memoranda (Docs. 54, 57).

## I.     BACKGROUND FACTS AS ALLEGED BY PLAINTIFF ITS

This case arises from a business dispute between ITS Financial, LLC ("ITS"),

Advent Financial Services, LLC ("Advent"), and NovaStar Financial, Inc. ("NovaStar").[1]

ITS franchises "Instant Tax Service" stores that provide tax preparation services directly

to customers. Advent partners with businesses such as ITS to provide certain tax related

financial products to the customers of tax preparation businesses, *e.g.*, early season loans

---

[1] NovaStar is a financial services company, and it is the parent company of Advent.

("ESLs")[2] and refund anticipation loans ("RALs").[3]

About a month before tax season, after a long series of negotiations, ITS entered into a License and Operations Agreement ("L&O Agreement") whereby Advent agreed to provide ESLs and RALs to customers of ITS franchised stores. Included in these negotiations was discussion about the anticipated funding that would be required to adequately fund ITS' need for ESLs and RALs. The Loan Forecast Volume outlined in the Agreement required lending capacities in the amounts of ten to twelve million dollars for the ESL program and approximately two hundred million dollars for the RAL program. Both parties knew that these amounts were based on a 50% approval rate for the loans, which was specifically provided for in the Agreement. Advent committed to using, and was later contractually obligated to use, its commercially reasonable best efforts to achieve this loan approval rate and assured ITS prior to contract formation that it had already acquired sufficient lending capacity to meet these projections.

---

[2] The ESL is an unsecured loan given prior to tax season (December 26 to January 14), normally ranging from $100 to $1000, with a minimum "consolation loan" of $10 given to applicants who are otherwise rejected for the larger loan amounts. The primary purpose of the ESL is to increase awareness among the public of ITS, by providing a contact between the prospective customer and the Instant Tax store location, as well as generally creating goodwill associated with the ITS brand. Historical data indicates that a substantial percentage of ESL customers come back during the tax season to apply for a RAL and/or have their taxes prepared at the same Instant Tax office that provided the ESL. In addition, an ESL program provides an overall competitive advantage against competitiors who fail to offer such a program or offer a program in smaller amounts or with lower approval rates. As with the RAL, Instant Tax does not itself provide the ESL to the customer, but partners with a lending institution and acts as a conduit for the loan. A successful ESL and RAL program is critical to obtaining customers in the segment of the tax preparation industry served by Instant Tax. (Ogbazion Aff. at ¶¶ 4-6).

[3] The RAL allows customers to receive a loan against their tax return (which is the collateral for the loan) at or shortly after the time of filing the return. When the tax refund is received from the ITS, it is used to pay back the loan. (Ogbazion Aff. at ¶ 3).

ITS alleges that Advent knew that, absent this assurance, ITS would have ceased negotiating with Advent because ITS would not have done business with a new company for a business venture of this size and import. Also based on this assurance, ITS ceased negotiating with Republic Bank ("Republic"), a potential business partner which was willing and able to provide a RAL program to ITS and which already had lending capacity sufficient to meet the aforementioned projections required by ITS. ITS entered into the Agreement with Advent based upon these assurances and paid $200,000 to a third party company to get it to waive an exclusivity clause in a contract it had with ITS to provide ESLs.

As it turned out, Advent did not have sufficient lending capacity to meet the agreed upon requirements, nor did Advent ever acquire such capacity. Yet, a few days before the start of the ESL and RAL program, NovaStar allegedly assured ITS that Advent had sufficient lending capacity in order to prevent ITS from resuming discussions with Republic. NovaStar also attempted to negotiate a new contract that significantly altered the terms of the original Agreement, and was highly prejudicial to ITS. The new contract altered ITS' rights under the original Agreement by, among other things, making ITS pay substantially more in funding and providing for a loan approval rate of 15% rather than 50% – a rate more closely resembling Advent's *actual* lending capacity. The lending criteria were unacceptable because the market served by ITS is mostly made up of customers with poor credit. The newly proposed lending criteria were specifically

designed to deny ESLs and RALs to precisely those to whom such loans are normally provided in the course of everyday business in the industry. After giving in to several of NovaStar's demands in order to get the ESL and RAL programs up and running, ITS declined to sign a new agreement. NovaStar then caused Advent to terminate its original agreement with ITS, leaving ITS without vital products necessary to compete in the tax preparation services industry.

Defendants move this Court to enter partial summary judgment in their favor with respect to the following counts of Plaintiff's complaint: (1) fraud in the inducement (Count I); (2) tortious interference with contract (Count III); (3) fraudulent misrepresentation (Count VI); (4) negligent misrepresentation (Count VII)[4]; and (5) declaratory judgment (Count VIII).[5] Additionally, Defendants request partial summary judgment on the following matters: (1) bar Plaintiff from recovering all damages identified in its Rule 26(a) disclosures[6] based on the contractual damages exclusion contained within the L&O Agreement; and (2) bar Plaintiff from recovering punitive damages because all of its tort claims fail as a matter of law and punitive damages are not available for breach of contract claims.

---

[4] Plaintiff concedes its claim for negligent misrepresentation. (Doc. 54 at 14, fn. 4).

[5] Plaintiff also asserts claims for breach of contract (Count II), breach of duty of good faith and fair dealing (Count IV), and piercing the corporate veil/joint and several liability (Count V), which are not currently before the Court.

[6] Plaintiff seeks over $88 million for "lost revenue," "lost profits," "lost franchise sales," and damage to "reputation."

## II.   UNDISPUTED FACTS[7]

### The License And Operations Agreement Between ITS and Advent

1.   ITS is engaged in the business of franchising business opportunities nationwide in the tax preparation and related bank products business. (Complaint at ¶ 1).

2.   In the summer of 2009, ITS entered into discussions with Advent to explore the possibility of Advent and ITS entering into an agreement whereby Advent would provide financial products related to the tax preparation process to customers of ITS.  (Complaint at ¶ 15).

3.   Eventually, on or about November 13, 2009, Advent and ITS entered into the L&O Agreement.  (*See* Complaint at ¶ 15; Ex. B - L&O Agreement).

4.   The L&O Agreement indicates it "is by and between ADVENT Financial Services, LLC ("ADVENT") and ITS Financial, LLC ("Licensee").  (L&O Agreement at 1).

5.   Under the L&O Agreement, the parties agreed that Advent would provide certain loan products to customers of ITS, including ESLs and RALs. (L&O Agreement at 2).

6.   The L&O Agreement provided that Advent would "[m]ake available all products and services identified in this Agreement and take all reasonable measures to ensure that ADVENT and all Partners are operationally prepared to deliver all products and services entailed in this Agreement." (L&O Agreement at 4).

7.   The L&O Agreement provided:

With respect to lenders, ADVENT covenants that it will obtain sufficient commitments for lending capacity to satisfy the agreement upon Loan Forecast Volume (as set forth in the attached Loan Forecast Volume Schedule) for the subject tax reason.  Provided, however, that if Licensee's actual volume exceeds the Loan Forecast Volume and ADVENT is unable

---

[7] *See* Docs. 48 and 66.  Plaintiff does not dispute any of Defendants' proposed undisputed facts.

to provide sufficient lending capacity to satisfy the additional volume, Licensee may obtain alternative lending commitments from third parties to the extent of any such excess.

(L&O Agreement at 5).

8.    The L&O Agreement provided:

Except for liability arising from a breach of the confidentiality obligations herein and compliance with the Manual, in no event shall either party have any liability with respect to its obligations hereunder for consequential, exemplary, punitive or incidental damages or for any lost profits, lost data, wasted management time or lost opportunity even if a party has been advised of the possibility of such damages.

(L&O Agreement at 8).

9.    NovaStar is the majority owner of Advent.  (Complaint at ¶ 3).

### The Promissory Note Between ITS and NovaStar

10.    On or about November 25, 2009, ITS and NovaStar entered into a Promissory Note, pursuant to which NovaStar lent ITS the sum of $3,000,000.  (Doc. 44, Ex. A; Doc. 45 at ¶ 4; Ex. D, Anderson Decla. at ¶¶ 3, 5).

11.    In the Note, ITS waived "the right to claim any defense based on any statute of limitations or on any claim of laches and waives any counterclaim, cross-claim, or set-off of any nature or description."  (Note at 4).

### The Damages Sought By ITS

12.    On or about November 8, 2010, ITS served Rule 26(a) disclosures on Advent and NovaStar that identify the classes of damages sought by ITS. (*See* Ex. E at ¶¶ 3-4).

13.    In its Rule 26(a) disclosures, ITS identified that it seeks to recover as damages certain "lost revenue" defined as follows:

Lost revenue from 2010 Tax Season (2009 Tax Returns) - $13,370,139; calculated as follows:

(a) Difference between forecasted paid bank products and actual number of paid bank products is $58,917. Multiply this number by Drake fees that were not generated of $15 per product = $883,755.

(b) Multiply total paid bank products projected by $32 per product (Advent fees) that were not generated = $4,858,752.

(c) Lost royalties from projected versus actual returns system wide = $4,681,782.

(d) Franchise fees paid by franchisees per bank product were less due to less overall volume; $50 x 58,917 = $2,945,850.

(*See* Ex. F, ITS Rule 26(a) Disclosures at Section III).

14.     ITS identified that it also seeks to recover as damages "Future lost profits, over the next four years (remaining term of agreement): $53,480,556 (assuming no growth of system)." (ITS Disclosures at Section III).

15.     ITS identified that it also seeks to recover as damages "Lost Franchise sales 2010 – $1,500,000." (ITS Disclosures at Section III).

16.     ITS identified that it also seeks to recover as damages "Damage to brand name, reputation – $20,000,000 – includes lost franchisees who exited system due to lack of product."

(ITS Disclosures at Section III).[8]

## III.   STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to

the Court demonstrates that there is no genuine issue as to any material fact, and that the

---

[8] Plaintiff provides 48 disputed issues of material fact. (Doc. 66). This presents an unusual posture given that Plaintiff has admitted all of Defendants' proposed undisputed facts. (*Id.*) Defendants claim that Plaintiff's proposed disputed facts are collateral to the merits of the motion. (Doc. 69 at 2).

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV.  ANALYSIS

### A.  Fraud Claims

A claim of fraudulent misrepresentation arises when a party is induced to enter into an agreement through fraud or misrepresentation. *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574 (1998). "Fraudulent inducement involves a general duty to avoid wrongful conduct that induces a party to enter into a contract." *Onyx Envtl. Servs. v. Maison*, 407 F.Supp.2d 874, 879 (N.D. Ohio 2005).[9] The elements of fraud under Ohio law are: (1) a representation or, when there is a duty to disclose, a concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with

---

[9] The elements of fraudulent misrepresentation and fraudulent inducement are essentially the same. *Genrile v. Ristas*, 828 N.E.2d 1021 (Ohio Ct. App. 2005).

such utter disregard as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance on the representation or concealment; and (6) an injury proximately caused by that reliance. *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859 (Ohio 1998).

In alleging fraud or mistake a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "At a minimum, [the plaintiff] must allege the time, place and contents of the misrepresentations upon which [it] relied." *Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2008). "Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Minger v. Green*, 239 F.3d 793, 800 (6th Cir. 2001).

Defendants argue that the allegations in the Complaint fall short of the standard. The Court disagrees. The Complaint pleads the claims with sufficient particularity to meet the Rule 9(b) standard: Defendants "knowingly made representations and assurances to Instant Tax that they had secured sufficient lending capacity to meet Instant Tax's requirements, and that they had the operational ability to develop and deliver the ESL and RAL programs." (Complaint at ¶ 56). "Defendants repeatedly represented – both before and after they signed the Agreement -- that they had secured lending commitments greater than $150,000,000 for the RAL program for Instant Tax." (*Id.* at ¶ 57). "Defendants intended to induce Instant Tax to rely on their representations that they had sufficient lending capacity to satisfy Instant Tax requirements." (*Id.* at ¶ 60). "Instant Tax's reliance on Defendants' representations caused detriment to Instant Tax in that

Defendants do not have sufficient lending capacity to fund its ESL and RAL program, which will result in a loss of customers." (*Id.* at ¶ 62).[10]

The L&O Agreement contains an express provision governing Advent's obligation to obtain lending capacity.[11] The L&O Agreement states: "ADVENT convenants that it will obtain sufficient commitments for lending capacity to satisfy the agreed upon Loan Forecast Volume." (L&O Agreement, Section 5(a)). Contrary to Advent's argument otherwise, ITS's misrepresentation claims are not based on Advent's failure to perform a duty encompassed by the L&O Agreement, but rather arise from Advent's alleged misrepresentation of fact during contract negotiations – specifically that it already had obtained sufficient lending capacity. Although Plaintiff's initial conversations were with Advent only, after the Agreement was entered into, Plaintiff alleges that Lance Anderson at NovaStar assured ITS that Advent had secured sufficient lending capacity when ITS expressed doubts. (Ogbazion at ¶ 21). Plaintiff claims that NovaStar's assurances were designed to and did in fact convince ITS from ceasing negotiations with an alternate business partner that was competing with Advent for ITS' business and ultimately prevented ITS from re-engaging Republic. (*Id.* at ¶ 22). Construing all facts and

---

[10]     Defendants claim that ITS cannot inject Mr. Ogbazion's allegations into the summary judgment because they were not set forth in the Complaint. *Indus. Assets, Inc. v. Capital Equip. Sales Co., Inc.*, 116 F.3d 1430, Table at *2 (6th Cir. 1997). The Court finds that the allegations in the Complaint meet the Rule 9(b) standard. Mr. Ogbazion's affidavit simply offers the requisite evidence to support those allegations at the summary judgment stage.

[11]  NovaStar is not a party to the L&O Agreement.

inferences in a light most favorable to the nonmoving party, Plaintiff alleges sufficient facts to maintain causes of action for fraudulent inducement and misrepresentation.

### 1. Factually Intertwined

Advent argues that the tort claims and contract claims are intertwined and therefore the tort claims merge with the contract claim. "A breach of contract does not create a tort claim." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 151 (1996). "A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Thornton v. Cangialosi*, No. 2:09cv585, 2010 U.S. Dist. LEXIS 51818, at *2 (S.D. Ohio 2010). "If the tort claim is factually intertwined with the breach of contract claim, such that the two cannot be separated, recovery cannot be had for both." *Id.* at 2.[12] This is so because claims of fraud ordinarily must be premised upon misrepresentations of past or existing fact, not promises relating to future actions or conduct. *Williams v. Edwards*, 717 N.E.2d 368 (Ohio 1st Dist. 1998).

---

[12] In *Thornton*, the defendant contractually agreed to purchase the plaintiffs' shares in a company upon the occurrence of certain contingencies. *Id.* at 1. In the same contract, the defendant warranted that he "will be solvent and will have total assets having a total fair market value in excess of the amount necessary to pay [the] debts as they become due." *Id.* When one of the contingencies was triggered, and the defendant failed to purchase the shares as promised, the plaintiffs sued for breach of contract and fraudulent inducement. *Id.* The fraudulent inducement claim was based on an allegation that, prior to the contract being signed, the defendant made the false statement that he "had sufficient net worth to consummate the agreement." *Id.* at 3. Even though the plaintiffs argued that their fraudulent inducement claim rested on a factual misrepresentation distinct from the contractual duty, the Court found that the two claims were "factually intertwined and cannot be separated" and "recovery cannot be had for both." *Id.* at 5.

-11-

Plaintiff's breach of contract claim, like its fraud-based claims, is based upon the interpretation that Defendants represented that they had sufficient lending capacity which concerned future conduct, and thus customarily would not be actionable as fraud. "An exception to this rule exists, however, where an individual makes a promise concerning a future action, occurrence, or conduct, and, at the time he makes it, has no intention of keeping the promise." *Williams*, 717 N.E.2d at 374. Here, Plaintiff does not contend that Defendants committed fraud by entering into the contract without any intention of performing according to the contract's terms, but instead that Defendants specifically intended to perform the contract pursuant to an interpretation of its terms that was contrary to the interpretation represented by Defendants to Plaintiff during negotiations, and upon which Plaintiff relied to its detriment in foregoing the Agreement. Plaintiff has made a *prima facie* case, where it asserts that Defendants made a promise which induced its reliance, and at the time such promise was made, Defendants had no intention of keeping the promise.[13]

ITS claims that Advent's misrepresentations were actions separate from the later breach of contract, and resulted in ITS losing more than just the loss of its bargain struck

---

[13] In *Telxon Corp. v. Federal Ins. Co.*, No. 00-4530, 309 F.3d 386 (6th Cir. 2002), the Sixth Circuit reversed the trial court's decision denying judgment notwithstanding the verdict after a jury found in favor of the defendant on its counterclaims for fraud. In doing so, the court of appeals cited the general rule that a breach of contract does not create a tort claim. However, the court also noted the exception to this rule, but found that it did not apply because although the defendant-counterclaims alleged that the plaintiff contracted without the intention to fulfill its promises, that accusation was "unsupported and flatly contradicted by the evidence." This Court, by contrast, has not yet had the benefit of any evidence "flatly contradicting" Plaintiff's claims, and therefore the claims cannot be dismissed on that basis.

with Advent subsequent to the misrepresentations.[14] Moreover, Advent's fraudulent misrepresentation did not occur simultaneously or consecutively with Advent's breach of contract – it occurred before contract formation. (Ogbazion Aff. at ¶ 12). *Eggert Agency, Inc. NA Mgmt. Corp.*, No. C2-01-1011, U.S. Dist. LEXIS 90830, at *7 (S.D. Ohio Aug. 12, 2008) (denying a 12(b)(6) motion on a similar claim in part because plaintiffs contended that their tort claims arose due to conduct that occurred prior to contract formation). In fact, ITS alleges that Defendants uttered fraudulent misrepresentations to induce ITS into certain acts and omissions both before and after ITS entered into the Agreement. (Ogbazion Aff. at ¶ 12).[15] ITS claims that it entered into the L&O Agreement and forwent negotiations with others in detrimental reliance on Defendants' misrepresentations that Advent had secured sufficient lending capacity. *Gator Dev. Corp. v. VHH, Ltd.*, No. C-080193, 2009 Ohio App. LEXIS 1525, at *4 (Ohio Ct. App. 2009) (ruling that plaintiff did not establish a separate fraud claim because plaintiff "did not allege any detrimental reliance on a positive misrepresentation").

---

[14] "When the promisee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promisor to fulfill the term of the bargain arises only from the contract." *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir. 1976).

[15] ITS alleges that it was damaged by NovaStar's misrepresentations because it caused ITS to lose the profits that would have been garnered from a deal reached with Republic in mid-December 2009. ITS also argues that had it entered into a contract with Republic, ITS would not have had to pay $200,000 to Mezzanine because Republic would not have provided funding for the ESL program. (Ogbazion Aff. at ¶ 14). Mezzanine's contract with ITS required exclusivity only for an ESL program. (*Id.*) Unlike ITS's potential deal with Republic, ITS's deal with Advent included funding for the RAL and ESL programs, thus requiring ITS to seek Mezzanine's waiver of its exclusivity clause with ITS. (*Id.* at ¶ 7).

-13-

## 2. Parol Evidence

Defendants claim that the parol evidence rule bars claims based on representations of fact that are inconsistent with the language of an integrated agreement, citing the L&O Agreement which contains a merger/integration clause:[16]

> This Agreement may only be amended in a writing signed by both parties, is not assignable or delegable by either party without prior written consent of the other party, and contains the entire understanding between the parties hereof and supercedes any prior discussions or agreements thereto.

*Id.* at 10. Defendants argue that ITS could not have reasonably relied on representations that Advent already had sufficient lending capacity when the written L&O Agreement expressly contemplates that Advent *would* obtain sufficient lending capacity.[17] However, parol evidence may be used to prove fraud in the inducement in Ohio. *Drew v. Christopher Const. Co.*, 41 N.E.2d 1018, 1010 (Ohio 1942).

---

[16] *See, e.g., Olah v. Ganley Chevrolet, Inc.*, 946 N.E.2d 771 (Ohio Ct. App. 2010). In *Olah*, Plaintiffs test drove a car from a dealership with only 541 miles on the odometer. *Id.* at 773. According to plaintiffs, the salesman represented to them that the car was "new" and that the 541 miles were from test drives and dealer usage. *Id.* at 773. Thereafter, the plaintiffs purchased the vehicle through a written sales contract that expressly stated the vehicle was "used." *Id.* Sometime later, plaintiffs attempted to make a warranty claim and learned that the vehicle had a previous owner and was, in fact, a used car. *Id.* The plaintiffs sued the dealership for fraud and fraudulent inducement. *Id.* at 774. On appeal, the court held that the misrepresentation claims should have been dismissed because they were inconsistent with the express statement in the sales contract stating that the car was used. *Id.* The court noted that the parol evidence rule "prohibits a party to a final written contract from contradicting or varying the terms thereof with evidence of prior oral representations, understandings, and negotiations." *Id.*

[17] *See, e.g., Wrase v. Ardis*, No. L-90-335, 1992 Ohio App. LEXIS 125, at *5 (Ohio Ct. App. Jan. 17, 1992) (with respect to fraud claim, no reasonable reliance on alleged pre-contract representation regarding financing that was inconsistent with language in home-sale agreement).

> [T]he Parol Evidence Rule will not exclude evidence of fraud
> which induced the written contract. But, a fraudulent inducement
> case is not made out simply by alleging that a statement or
> agreement made prior to the contract is different from that which
> now appears in the written contract. Quite to the contrary,
> attempts to prove such contradictory assertions is [sic] exactly
> what the Parol Evidence Rule was designed to prohibit.

*Galmish v. Cicchini*, 734 N.E.2d 782, 790 (Ohio 2000). "[T]he parol evidence rule does

apply to . . . promissory fraud if the evidence in question is offered to show a promise

which contradicts an integrated written agreement. Unless the false promise is either

independent of or consistent with the written instrument, evidence thereof is

inadmissible." *Id.* at 791.[18] *See also Glazer v. Lehman Bros.*, 394 F.3d 444, 457 (6th Cir.

2005) (quoting the same language and applying the "independent of or consistent with"

test). The Ohio Supreme Court's analysis in *Galmish* is fatal to Defendants' position.

### 3. Economic Loss Rule

Finally, Defendants argue that "[t]he economic-loss rule generally prevents

recovery in tort of damages for purely economic loss." *Corporex v. Dev. & Constr.*

*Mgmt., Inc. v. Shock, Inc.,* 835 N.E.2d 701, 704 (Ohio 2005). However, read in context,

---

[18]       Contrary to [defendant's] assertions, this principle does not lose its
         force merely because the considered written agreement contains an
         integration clause. The parol evidence rule applies, in the first
         instance, only to integrated writings, and an express stipulation to
         that effect adds nothing to the legal effect of the instrument. The
         presence of an integration clause makes the final written
         agreement no more integrated than does the act of embodying the
         complete terms into the writing. Thus, the presence of an
         integration provision does not vitiate the principle that parol
         evidence is admissible to prove fraud. *See Blackledge v. Allison
         (1977), 431 U.S. 63, 75.*

         *Id.*

the court in *Corporex* was discussing simple negligence actions and not intentional torts. Immediately after the above statement, the Ohio Supreme Court quoted an earlier decision (*Chemtrol Adhesives, Inc. v. American Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 630 (1989 Ohio)), that specifically states as follows: "[t]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Id.*

Other courts have been critical of the *Corporex* decision to the extent that it suggests that all torts are barred by the economic loss rule where there is a contract. For example, the Ninth Circuit Court of Appeals observed that the economic loss doctrine has caused much confusion, primarily because some courts have mistakenly stated in "overly broad terms that purely economic losses cannot be recovered in tort." *Giles v. GMAC*, 494 F.3d 865, 874 (9th Cir. 2007). The court in *Giles* asserted that "[s]uch broad statements are not accurate [as] tort law has traditionally protected individuals from a host of wrongs that cause only monetary damage" such as fraud, fraud in the inducement, or conversion actions. *Id.* at 875 (noting that "[m]ost courts that have applied the economic loss doctrine beyond product liability cases have done so to bar recovery of economic loss in negligence and strict liability.").[19]

---

[19] *See also Long v. Time Ins. Co.*, 572 F.Supp.2d 907, 912 (S.D. Ohio 2008) ("Negligent misrepresentation claims survive the economic loss doctrine."). It would be inconsistent to find that negligent misrepresentation claims survive the economic loss doctrine while fraud or fraud in the inducement claims do not. *Onyx Envtl. Services v. Maison*, 407 F. Supp.2d 874, 879 (N.D. Ohio 2005) (finding that because fraud and contract duties are distinct from one another, the economic loss doctrine does not bar plaintiff's fraud claim).

In *Gator Dev. Corp. v. VHH Ltd.*, No. C-080193, 2009 Ohio App. LEXIS 1525, at *4 (Ohio Ct. App. 2009), the court held that the economic loss doctrine barred a fraud claim because it was a "recapitulation of the breach-of-contract claim, seeking recovery of the same economic loss contemplated by the contract." Conversely, in the instant case ITS seeks damages distinct from and in addition to damages caused by Advent's breach of contract.[20]

## D.  Tortious Interference (Count III)

The "torts of interference with business relationships and contract rights generally occur when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999). A plaintiff bears the burden to prove "lack of privilege" or "improper interference." *Id.* Under Ohio law, a parent company is privileged to interfere with the contracts of a subsidiary for the purpose of protecting the parent company or the subsidiary's financial interest. *Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).[21]

---

[20] The damages sought were not contemplated by the Agreement, e.g., the $200,000 paid to Mezzanine and profits from a contract with Republic (caused first by Advent's misrepresentations and later by NovaStar's misrepresentations.).

[21] *See also Kirk v. Shaw Envtl., Inc.*, No. 1:09cv1405, 2010 U.S. Dist. LEXIS 31759, at *8 (N.D. Ohio 2010) ("[U]nder Ohio law, a plaintiff cannot state a claim for tortious interference against a parent company for interfering with the business relationships . . . of its subsidiary, because the parent company is not a third-party to its subsidiary's business relationships."); *Horton v. Telxon Corp.*, 716 N.E.2d 786, 792 (Ohio Ct. Com. Pl. 1999) ("a parent company cannot tortiously interfere with a contract of a subsidiary").

ITS's complaint alleges that NovaStar became involved in the contractual relationship between ITS and Advent in an "attempt to limit Advent's outstanding liabilities" because Advent could not secure sufficient lending capacity. (Complaint at ¶¶ 44, 48, 52, 53). ITS relies on *GZK, Inc. v. Schumaker P'ship*, No. 22172, 2008 Ohio App. LEXIS 1690 (Ohio Ct. App. Apr. 28, 2008), which addressed the extent to which a non-parent, third-party may be justified in interfering with a contractual relationship. *Id* at 19. *GZK* applies a multi-factor test from Section 767 of the Restatement of the Law of Torts – but this test does not apply to a claim of tortious interference asserted against a parent company. The privilege enjoyed by a parent company is not dependent on a Section 767 analysis.

Accordingly, Defendants' motion for summary judgment on the tortious interference claim (Count III) is **GRANTED**.

### E. Declaratory Judgment (Count VII)

ITS requests Declaratory Judgment, seeking a declaration that:

> Any amounts due and owing by Instant Tax to NovaStar as a result of the loan NovaStar made to Instant Tax in conjunction with the [L&O] Agreement and as part of the consideration for the Agreement (which was fraudulently induced) should be offset against monies used and owing to Instant Tax as a result of this action.

(Complaint at ¶ 104).

This claim fails because ITS waived the defense of setoff in the Note:

> [T]he right to claim any defense based on any statute of
> limitations or on any claim of laches and waives any
> counterclaim, cross-claim, or set-off of any nature or
> description

Note at ¶ 13.[22]

Accordingly, Defendants' motion for summary judgment on the declaratory

judgment claim (Count VIII) is **GRANTED**.

### F.     Damages

Per its Rule 26(a) disclosures, Plaintiff seeks to recover damages of approximately

$88 million, consisting of lost "revenue" or various forms of consequential damages, lost

profits, and lost opportunities.

The L&O Agreement states:

> [I]n no event shall either party have any liability with respect to
> its obligations hereunder for consequential, exemplary, punitive
> or incidental damages or for any lost profits, lost data, wasted
> management time or lost opportunity, even if a party has been
> advised of the possibility of such damages.

*Id.* at 8.  The express terms of the L&O Agreement bar the recovery of both consequential

damages and lost profits.  Plaintiff argues that the L&O Agreement is unconscionable.

However, clauses barring recovery of both consequential damages and lost profits are

fully enforceable.  *See, e.g., Gen Elec. Capital Corp. v. Rauch*, 970 S.W.2d 348, 358 (Mo.

Ct. App. 1998) (consequential damages); *Roy A. Elam Masonry, Inc. v. Fru-Con Const.*

---

[22]     *See also* discussion of set-off in this Court's decision at Doc. 72.

-19-

*Corp.*, 922 S.W.2d 783, 791 (Mo. Ct. App. 1996) (consequential damages); *World Enters., Inc. v. Midcoast Aviation, Servs.*, 713 S.W.2d (consequential damages, incidental damages, and lost profits).[23]

Defendants characterize Plaintiff's damage claim against Advent as consequential damages because ITS's reduction in revenue "is a consequence of Advent's breach of the contract." (*Id.* at 32). Defendants also characterize ITS's damages against Advent as "lost profits" thereby encompassing them within the damages limitation clause. This characterization bars recovery of all possible damages because all damages recoverable under a breach of contract are lost profits of some kind.

Missouri distinguishes between three different types of damages:

> Actual damages are compensatory and are measured by the loss or injury sustained as a direct result of the wrongful act. Consequential damages are those damages naturally and proximately caused by the commission of the breach and those damages that reasonably could have been contemplated by the defendant at the time of the parties' agreement. Finally, benefit-of-the-bargain damages, also called lost profits damages, are the net profits a plaintiff would have realized had the contract not been breached. There are situations in which all three types of damages could be deemed appropriate by a finder of fact, but that is not always the case.

*Catroppa v. Metal Building Supply, Inc.*, 267 S.W.3d 812, 818 (Mo. Ct. App. 2008).

---

[23] Moreover, in the instant case, the L&O Agreement was negotiated between two sophisticated commercial parties and the damage limitation applied equally to both parties. These facts favor enforcement.

ITS' first category of damages, "Lost revenue[24] from 2010 Tax Season," (Rule 26(a) Disclosures §III(1)(a)-(d)), constitutes the nonexistent revenue that would have been garnered from customers in exchange for the service that Advent contracted to provide. This is exactly the revenue ITS contracted for, and this is how ITS was going to make money from the contract. The second category of damages, "Future lost profits, over the next four years (remaining term of agreement)," (*Id.* at §III(2)), is the exact same type of damages listed in §III(1)(a)-(d) extended out for the length of the Agreement. Plaintiff argues that Defendants' characterization of these damages as "lost profits" is irrelevant.[25] Plaintiff maintains that the issue before the Court is into which category of damages these lost profits fall, actual or consequential. Actual damages *include* lost profits, which may be recovered if: (1) profits were within the contemplation of the parties at the time the contract was made; (2) the loss of profits is the probable result of the breach of contract; and (3) the profits are not remote and speculative and may be shown with reasonable certainty. *Charles R. Combs Trucking Inc. v. Int'l Harvester Co.*, 466 N.E.2d 883 (Ohio 1984). Plaintiff cannot simply characterize lost profit damages as

---

[24] In calculating lost profits damages, lost revenue is estimated, and overhead expenses tied to the production of that income are deducted from the estimated lost revenue. *Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo. 1968). Plaintiff claims that the most direct damage caused by a failure to deliver the service (loans) would be the nonexistent revenue garnered from customers in exchange for the service.

[25] ITS concedes that the damages it seeks for "Lost revenue from 2010 Tax Season (2009 Tax Returns) – $13,370,139" and "Future lost profits, over the next four years (remaining term of agreement $53,480,556 (assuming no growth in system)" are lost profits damages. (Doc. 54 at 17).

-21-

actual damages and thereby dodge the express terms of the L&O Agreement. In the final analysis, the Court concludes that Plaintiff seeks lost profits and consequential damages which are expressly precluded by the L&O Agreement.

### G. Punitive Damages

Fraudulent inducement and fraudulent misrepresentation are tort claims. *Yo-Can, Inc. v. The Yogurt Exchange, Inc.*, 778 N.E.2d 80 (2002). Punitive damages may be recovered by a plaintiff injured by fraudulent inducements or misrepresentations. *Curran v. Vincent*, No. C-060521, 2007 Ohio App. LEXIS 3360 (Ohio App. July 20, 2007). In such a case, exemplary damages are available in tort even if the case incidentally involves a contract. *Id.* Under Ohio law, punitive damages may be awarded in tort actions that involve fraud, actual malice, or insult. *Preston v. Murty*, 512 N.E.2d 1174, 1175 (Ohio 1987).

Accordingly, Defendants request to bar Plaintiff from recovering punitive damages is **DENIED**.

### V. CONCLUSION

Based on the evidence of record, the Court finds that Defendants' motion for partial summary judgment (Doc. 48) is **GRANTED** with respect to negligent misrepresentation (Count VII), tortious interference (Count III), declaratory judgment (Count VIII); and lost profits and consequential damages, and **DENIED** as to fraud in the inducement (Count I); fraudulent misrepresentation (Count VI), and punitive damages.

**IT IS SO ORDERED.**

Date:  10/11/11

Timothy S. Black
United States District Judge